**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| JENNIFER GORDON, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | No. 18-CV-0007-KEM <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Plaintiff Jennifer Gordon seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f, and for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Gordon argues that the Commissioner erred in evaluating Gordon's subjective complaints, in weighing medical opinion evidence, and in determining appropriate limitations for Gordon's RFC. For the reasons that follow, I **reverse** the Commissioner's decision and **remand** for further proceedings.

### I. BACKGROUND[1]

Gordon has suffered from daily headaches since 2009. AR 471, 584-86. She has been treated by her primary care physician, Mark Goedkin, MD, and she began receiving treatment from neurologist Winthrop Risk, MD, in May 2010, and continued to see him through at least September 2016. AR 471, 577, 584, 616-17. Gordon has been diagnosed with hemicrania continua[2] as well as migraines. AR 444-46, 616-17, 550, 695-96. She

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 14).
[2] "Hemicrania continua is a chronic and persistent form of headache marked by continuous pain that varies in severity, always occurs on the same side of the face and head, and is superimposed

has also been seen by Laurence Krain, MD (in 2009), rheumatologist Shahin Bagheri, MD (in 2010 and 2013), neurologists Marc Hines, MD (in July and August 2014), and Harold Adams Jr., MD (in December 2014), and pain specialist Rahul Rastogi, MD (in February 2015). AR 417-19, 424-26 (Dr. Bagheri); 547-62 (Dr. Hines); 588-94 (Dr. Krain); 690-94 (Dr. Adams); 694-99 (Dr. Rastogi). In February 2010, Dr. Bagheri diagnosed Gordon with diffuse myofascial pain and fibromyalgia, and Dr. Risk noted tenderness during musculoskeletal examinations in 2012 and 2013. AR 426, 432, 442, 445. In July 2016, Gordon also began seeing David Ross, LISW, ACSW, (Therapist Ross) for depression. AR 613-15.

Gordon's headaches vary in intensity and cause constant pain at the back and on the left side of her head. AR 298-99, 695. On a ten-point scale, Gordon rates her average, daily headache pain at four minimum and five to seven on average with flares up to nine or ten. AR 43, 298, 547, 695. Her headaches cause photophobia, phonophobia, and nausea, and they worsen with overstimulation (including to light and noise), activity, stress, and focusing on things. AR 40, 547, 690, 695. In addition to her daily headaches, Gordon more recently began suffering migraines, which cause pain throughout her entire head (rather than just at the back and left side) and worsen as the day goes on. AR 44, 550, 616-19, 695. They also cause increased nausea and a sense of feeling unwell, and they require Gordon to lie down, usually for the rest of the day. AR 44, 547, 619. Gordon indicated her fibromyalgia causes increased sensitivity to pain. AR 45.

In February 2014, Gordon filed for SSI and DI benefits, alleging disability since March 1, 2012. AR 65-67. Gordon claimed disability based on hemicrania continua;

---

with additional . . . symptoms." *Hemicrania Continua Information Page*, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Hemicrania-Continua-Information-Page (last modified June 27, 2018).

2

vision issues; low blood pressure, fainting, and balance issues; light and sound sensitivity; nausea; anemia; and constant plugged ears. AR 67. Her applications were denied initially in May 2014 and upon reconsideration in October 2014. AR 65-66, 81-82, 97-100, 120-21, 141-42. In connection with the initial review, the Social Security Administration ordered a consultative examination, which was completed by Harlan Stientjes, PhD, on May 5, 2014. AR 71, 87, 507-11. The initial reviews also included RFC opinions from state agency consultants Melodee Woodward, MD, dated April 22, 2014 (AR 73-77, 89-93), and Rhonda Lovell, PhD, dated May 21, 2014 (AR 77-80, 93-96). The reconsideration reviews included RFC opinions from Marlene Ann Gernes, DO, dated October 22, 2014 (AR 109-10, 115, 130-31, 133-36), and Myrna Tashner, EdD, dated October 10, 2014 (AR 116-18, 137-39), which affirmed the initial review RFC opinions.

Gordon requested further review, and she submitted RFC opinions from Dr. Risk and Therapist Ross, both dated August 30, 2016. AR 166, 577-83. The administrative law judge (ALJ) conducted an administrative hearing[3] on November 17, 2016, at which Gordon and a vocational expert (VE) testified. AR 13, 33-35. The ALJ issued a written decision on December 28, 2016, following the familiar five-step process outlined in the regulations[4] for determining whether Gordon is disabled. AR 13-25. The ALJ found

---

[3] It is not clear if this hearing was in person (AR 35) or with Gordon appearing by video (AR 13).

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

Gordon suffers from severe impairments of migraine headaches, cervical degenerative disc disease, fibromyalgia, and depression, and that her other alleged impairments (anxiety, left-sided loss of sensation, vision problems, speech impairment, dizziness, and balance issues) are not medically determinable. AR 15-16. After finding Gordon's impairments do not meet or equal a listed impairment, the ALJ determined she has the RFC[5] to perform light work with postural limitations and the following additional limitations:

- limited to normal office noise levels;
- cannot be in an environment with bright lights;
- limited to simple, routine, repetitive work;
- limited to work involving no public contact; and
- limited to no specific production rate requirements.

AR 17. The ALJ found Gordon was not able to perform past relevant work (as a janitor or janitor supervisor) because it required medium level of exertion. AR 24, 35-36, 394. The ALJ concluded that Gordon could perform other work as a router, routing clerk, or mail clerk, and that she was therefore not disabled. AR 24-25.

The Appeals Council denied Gordon's request for further review on October 31, 2017 (AR 1), making the ALJ's opinion the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. Gordon filed a timely complaint in this court (Docs. 1, 3). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 15, 16, 17), and consented to the jurisdiction of a United States magistrate judge (Doc. 13).

---

[5] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

## II. LEGAL FRAMEWORK

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Gordon argues the ALJ's decision must be reversed because: (1) the ALJ erred in discounting Gordon's subjective allegations of her symptoms and their limiting effects; (2) the ALJ erred in weighing medical opinions; and (3) the ALJ's RFC determination is not supported by substantial evidence. For the reasons discussed below, I find the ALJ's findings and RFC determination are not supported by substantial evidence in the record.

## III. DISCUSSION

### A. Subjective Complaints

When evaluating the credibility of a claimant's subjective complaints, an ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804

F.2d 456 (8th Cir. 1986).[6] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). "'Credibility determinations are the province of the ALJ[,]' [and a reviewing] court defers to the ALJ's determinations 'as long as good reasons and substantial evidence support the ALJ's evaluation'" of a claimant's subjective complaints. *Nash v. Comm'r Social Security Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)).

Gordon reported her headaches and pain are worsened by noise, light, hot and cold temperatures, overstimulation, and stress. AR 40-42, 51, 293, 298. She alleged her headaches and associated pain affect her memory and ability to concentrate and focus, and make her slower at performing tasks because of her pain and trouble focusing . AR 40, 49-54, 296-97, 299, 301-02, 306, 308. Gordon testified that in addition to her daily headaches, she suffers from migraines around three times per week. AR 44. She reported using icepacks and lying down in a quiet, dark room to help relieve headache pain, but when her pain reaches a certain point, she must go to bed, usually for the rest of the day. AR 44, 46, 295, 298; *see also* AR 506 (Gordon reported lying around with an icepack for four days due to a bad headache in March 2014). Gordon also reported a loss of sensation, tingling, and numbness on her left side; an inability to lift more than 20 pounds with her left arm; issues with grip that cause her to drop items; and issues with her vision, speech, and hearing. AR 42-43, 45-46, 48, 295-96, 299.

---

[6] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

The ALJ noted that Gordon alleged her symptoms limit her to performing unskilled work; cause issues with her ability to stay on task, maintain attention and concentration, handle stress, and interact with others; and would require her to take unscheduled breaks and be absent four or more time per month. AR 18. The ALJ did not credit these subjective allegations, however, based on (1) a lack of psychological treatment, (2) the results of physical examinations, and (3) Gordon's activities of daily living. *Id*. Based on the record in this case, I do not find the ALJ provided good reasons supported by the record for discounting Gordon's subjective complaints.

In addressing a lack of psychological treatment, the ALJ correctly noted that Gordon only received such treatment from June to August 2016. AR 20; *see also* AR 613-615 (Therapist Ross's treatment records). "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." ***Singh v. Apfel***, 222 F.3d 448, 453 (8th Cir. 2000). An ALJ should not, however, discount subjective complaints due to a lack of treatment "without considering the possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints." Evaluation of Symptoms in Disability Claims, **Social Security Ruling (SSR) 16-3p**, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016), *as amended*, 81 Fed. Reg. 15776 (Mar. 24, 2016) (changing effective date to March 28, 2016); *see, e.g., **Watkins v. Astrue***, 414 F. App'x 894, 898 (8th Cir. 2011) (Colloton, J., concurring) (agreeing with decision to remand where "ALJ's opinion lacks an adequate discussion" about noncompliance with treatment); ***Renshaw v. Berryhill***, 4:16-CV-1467 NAB, 2017 WL 4176437, at *5-6 (E.D. Mo. Sept. 21, 2017) (remanding, in part, for failure to consider why claimant missed treatment). The ALJ here did not question Gordon at the administrative hearing

7

about her lack of psychological treatment, nor did the ALJ address *why* Gordon may have not sought such treatment.[7]

The ALJ's failure is especially troubling because Gordon's depression results from her other impairments (AR 613), and the record shows she has received extensive treatment for those impairments.[8] The record here shows (as it did for the claimant in *Singh*) that Gordon has made "repeated and consistent visits to doctors" and has tried "numerous prescription medications" and "many pain treatment modalities," *Singh*, 222 F.3d at 453, that overall, have either not helped or caused significant adverse side effects. AR 250, 325, 445, 471-73, 498, 504, 506, 514, 552, 616-17, 618-624, 643, 645, 647, 651, 692. Indeed, this treatment history suggests Gordon's symptoms are in fact "intense and persistent." **SSR 16-3p**, 81 Fed. Reg. at 14170. In addition, the ALJ "failed to consider the dosage, effectiveness, and side effects of [Gordon]'s medications." *Beckley v. Apfel*, 152 F.3d 1056, 1060 (8th Cir. 1998) (noting ALJ's failure to consider this

---

[7] The record provides some indication that financial issues have impacted Gordon's available treatment options. *See* AR 473 (somewhat limited in treatment options because of insurance change); 616 (high co-pay for medication noted); 633, 645 (unable to afford specific transcutaneous electrical nerve stimulation (TENS) unit for migraines).

[8] Gordon has tried numerous prescription medications (indomethacin, Topamax, lamotrigine, Depakote, carbamazepine, amitriptyline, nortriptyline, Cymbalta, Keppra, Lyrica, baclofen, Flexeril, tizanidine, lidocaine cream, intravenous DHE, prednisone, gabapentin, levetiracetam, promethazine, hydrocodone, Savella, Naprosyn, Celebrex, clonidine, and Maxalt) and multiple injections (sumatriptan, botox injections, trigger point injections, and occipital nerve blocks). AR 471, 584, 616-21, 637, 695; *see also* 249-50. She has also tried various medication dosages and repeated injections, despite known adverse side effects or ineffectiveness in an attempt to alleviate her symptoms. AR 434, 445, 498, 506, 624, 643-45. In addition to medications and injections, Gordon has seen a nutritionist (no specific recommendations made) and used a TENS unit. AR 633, 645, 695. She received long-term relief only from indomethacin but cannot take the medication long term due to the gastrointestinal side effects. AR 429-30, 437, 445, 619, 647. Physicians have been unable to offer any additional treatment options (aside from Dr. Rastogi's suggestion of considering possible referral for evaluation "for possible deep brain stimulator placement," which Dr. Risk disregarded). AR 621, 624, 629, 631, 635, 639, 692, 698.

*Polaksi* factor in reversing and remanding to allow VE testimony about the effects of the claimant's impairments on her RFC where the ALJ erred in discounting the claimant's subjective complaints). Here, an absence of psychological treatment does not support the ALJ's decision to discount Gordon's subjective complaints. *See id.* (holding numerous doctor visits and use of various forms of treatment to relieve pain did not support ALJ's decision to disbelieve claimant's subjective complaints based on minimal treatment).

Next, the ALJ relied on the results of physical examinations contained in the treatment records to discount Gordon's subjective complaints. AR 18. The ALJ relied on Dr. Stientjes's one-time mental status examination to conclude that Gordon was capable of social interactions and maintaining concentration, persistence, and pace consistent with the ALJ's RFC determination. AR 19. This does not constitute substantial evidence to support the ALJ's conclusion, especially in light of Dr. Stientjes's overall opinion about Gordon's limitations (AR 510-11; *see also infra* at 12) and the overall record in this case as discussed below. The only other examination records specifically referenced by the ALJ in discussing Gordon's subjective complaints related to her alleged symptoms of loss of sensation on her left side and issues with her vision, speech, dizziness, and loss of balance (to which the ALJ gave "little credence"). AR 21. The ALJ concluded the referenced examination results (AR 421, 432, 439, 647) did not support Gordon's allegations of issues with sensation, vision, speech, dizziness, and balance. AR 21-22. The ALJ's conclusion, however, is not supported by the record. Multiple treatment notes record findings of loss of sensation on Gordon's left side. AR 592 (Dr. Krain noted decreased sensation on "entire left side" during November 2009 examination); 442, 445, 514, 619, 621, 643, 647 (examinations by Dr. Risk in February and April 2012, May and October 2014, and May and July 2016); 532 (emergency room examination in June 2014); 692 (examination by Dr. Adams in December 2014); 698 (examination by Dr. Rastogi in February 2015). The ALJ decided Dr. Risk's May 2014

findings were based on Gordon's subjective complaints. AR 22. This fails to recognize that sensory deficits may constitute a symptom of pain that can be "clinically observed and recorded" by medical providers. **SSR 16-3p**, 81 Fed. Reg. at 14168; *see also* **20 CFR §§ 404.1528**, **404.1529(c)(2)**, **416.928(b)**, **416.929(c)(2)** (2016). Examination records also substantiate at least some of Gordon's other claims. AR 515-17 (April 2014 emergency room examination found weak grip); 692 (in December 2014, Dr. Adams noted cautious station and gait, bilateral breakaway weakness, slow coordination (worse on the left side), constricted vision on the left side, and slightly diminished hearing in the left ear; he attributed these symptoms to Gordon's headaches and neurological issues, rather than strokes); 666-67 (in March 2015, emergency room personnel observed Gordon had difficulty speaking and demonstrated constant, irregular movements, which were attributed to her headaches). Substantial evidence does not support the ALJ's reliance on Gordon's physical examination results to discount her subjective complaints.

The ALJ noted Gordon's headaches, fibromyalgia, and cervical disc disease "warrant some extent of workplace limitation," but found "insufficient support for and several inconsistencies with the limitations alleged by the claimant and Dr. Risk." AR 22. Thus, it appears the ALJ relied on other inconsistencies in the record to discount Gordon's subjective complaints. The ALJ pointed to Dr. Risk's November 2014 treatment notations that MRI results did not explain Gordon's left arm discomfort and that Gordon "look[ed] okay" during the visit despite her report of experiencing moderate pain at that time. AR 22, 641. The ALJ relied on this one subjective observation by Dr. Risk, but made no mention of the multiple notations by Dr. Risk that were consistent with Gordon's reported pain. *See* AR 498, 504, 621, 623, 631, 633, 647, 651 (noting Gordon looked miserable or that she looked like she had a headache). The ALJ also failed to address that in the same November 2014 treatment note, Dr. Risk questioned whether Gordon's abnormal MRI results ("an increasing number of white spots" on her

10

brain) might be the result of another condition (a patent foramen ovale) potentially associated with headaches and that he requested additional testing (Gordon was referred to Dr. Adams). AR 639, 641. Dr. Adams found it was unlikely that Gordon's abnormal MRI results were caused by stroke but that they "may be related to her headaches and migraines." AR 692. Dr. Adams also concluded that Gordon's "focal neurological complaints of sensory loss and weakness on the left side" warranted continued evaluation for vascular disease and that if her headaches could be controlled, "her other neurological symptoms would improve." AR 692. Similarly, the ALJ relied on Dr. Risk's conclusion that Gordon's abnormal MRI results "were likely due [to] small vessel ischemic disease—not an underlying neurological condition." AR 22, 485. The record the ALJ relies on (included with an October 2013 Report of Incapacity), however, appears to have been prepared by Gordon and not Dr. Risk. *See* AR 484 (typed document titled "What Do we Know" that states, in describing swelling in feet and hands that "*I* am unable to open and close *my* hands, especially the left one and it takes 1-2 hours before *I* can fully do this" (emphasis added)). The treatment records cited by the ALJ are not inconsistent with Gordon's allegations or the record as a whole.

As for Gordon's activities of daily living, although the ALJ noted that Gordon told the consultative examiner (Dr. Stientjes) that she does housework and cooks, the ALJ relied primarily on Gordon providing child care for a neighbor to discount her subjective complaints. AR 19-20. Gordon provided daycare for the child from 2012 to August 2015, and briefly in the summer of 2016. AR 19, 253, 263, 372, 392. The ALJ relied on this activity to find Gordon could "perform light, unskilled work" with a production rate limitation, and that with a limitation on public contact, she could get along with co-workers and supervisors. AR 18, 20. Specifically, the ALJ, in a set of rhetorical questions, found Gordon's childcare activities demonstrated she could pay attention for more than 10-15 minutes, stay on task more than seventy percent of the day, and interact

11

with others. AR 19-20. The ALJ disbelieved Gordon's allegations that others were home during the periods she watched the child. AR 19, 253-55; *but see* AR 39-40, 291, 302, 309, 319, 329, 337-38, 372. Regardless, the ALJ failed to address the fact that Gordon stopped providing childcare and more significantly, that her condition worsened after that time. Gordon went to the emergency room in March 2015 for stroke-like symptoms and was treated for headache (AR 631, 655-67); her daily headaches began to worsen in March 2016 (AR 620-23); and she began suffering migraines on top of her daily headaches around July 2016 (AR 616-19). The ability to care for young children may be inconsistent with a claimant's alleged limitations. *See **Ramirez v. Barnhart***, 292 F.3d 576, 581-82 (8th Cir. 2002) (accepting ALJ's decision to discount subjective complaints, in part, based on claimant caring for her minor children). This is not always the case, however, and childcare activities are not necessarily inconsistent with a claimant's alleged limitations or a finding of disability. *See **Morris v. Apfel***, No. C93-1027 MJM, 1999 WL 33656860, at *1, 4-5 (N.D. Iowa Jan. 20, 1999) (remanding for benefits due to impairments stemming from chronic fatigue syndrome despite claimant's ability to provide full-time childcare for a child); *see e.g.,* ***Shontos v. Barnhart***, 328 F.3d 418, 420, 427 (8th Cir. 2003) (holding that claimant's impairments were equivalent to a listing despite her ability to babysit for her granddaughter). Gordon's supervision of a child with others present does not equate to an ability to focus and function in the workplace. The record here does not support the ALJ's finding that Gordon's limited childcare activities are inconsistent with her alleged limitations in being able to maintain attention and concentration, stay on task, and be present at work.

Finally, the ALJ's RFC determination limited Gordon's exposure to bright lights and noise (although it is not clear if the limitation for noise stems from Gordon's headaches or hearing loss). AR 17. The ALJ found, based on Dr. Stientjes's consultative examination (AR 507-11) and Therapist Ross's treatment notes (AR 613-15), that Gordon

12

could perform unskilled work and interact with others. AR 19. The ALJ did not specifically address, however, what impact Gordon's migraines or headache flares would have on her ability to work (in particular, her need for unscheduled breaks and to be absent when she suffers from a migraine). This failure further undermines the RFC determination. *See, e.g., Stewart v. Colvin*, No. C13-2029, 2014 WL 1165870, at *13 (N.D. Iowa Mar. 21, 2014) (finding ALJ erred by failing to address claimant's difficulties with migraines, including how they impacted the claimant's need to take breaks and be absent, when the record showed these migraines caused photophobia, phonophobia, and nausea, and sometimes required emergency room treatment).

Overall, the record here (including Gordon's daily activities, physical examination results, and treatment history) does not "weigh[] so heavily against [Gordon]'s credibility that the ALJ would necessarily have disbelieved her absent the erroneous inferences he drew from the record." *Ford v. Astrue*, 518 F.3d 979, 982-83 (8th Cir. 2008) (remanding where ALJ failed to properly consider the evidence because claimant's activities of daily living did not contradict her alleged limitations and because it was unclear which portion of the medical record the ALJ relied on in finding claimant had minimal limitations). The reasons cited by the ALJ to discount Gordon's subjective allegations about her pain and its limiting effect are not supported by substantial evidence, and the allegations are not inconsistent with the record as a whole. The ALJ erred in assessing Gordon's subjective complaints for the reasons provided.

### B. *Medical Opinion Evidence*

When determining a claimant's RFC, an ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. §§ 404.1527(b), 416.927(b)**.[9] Gordon

---

[9] The Social Security Administration adopted new regulations for evaluating medical opinions that went into effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, **82 Fed. Reg. 5844** (Jan. 18, 2017). Rather than stating that these rules are

argues the ALJ erred in weighing Dr. Risk's medical opinions, and as a result, the state agency consultants' opinions. First, there is no dispute that Dr. Risk, who has treated Gordon on a regular basis since 2010, qualifies as a treating source (AR 23, 445, 577). *See Owen v. Astrue*, 551 F.3d 792, 798-99 (8th Cir. 2008). An ALJ must give controlling weight to a treating-source opinion if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Id*. at 798; **20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)**. In addition, because he is a neurologist, Dr. Risk's opinion is also entitled to greater weight than opinions from nonspecialists, unless Dr. Risk's opinion is "controverted by substantial evidence or otherwise discredited." *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000). "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

Dr. Risk submitted a medical source statement (MSS) dated August 30, 2016. AR 577-80. He found Gordon could not perform even "low stress" work, that she would need to take "a lot" of unscheduled breaks (up to the rest of the day), that she would be off task at least twenty-five percent of the time, and that she would be absent from work more than four days per month. AR 578-59. Dr. Risk also noted that Gordon has issues

---

not retroactive (its usual practice), the Social Security Administration issued two sets of new regulations, one governing claims filed on or after March 27, 2017, and one governing claims filed before that date, which are substantively the same as the old rules. *See, e.g.*, **20 C.F.R. §§ 404.1527, 404.1520c**. The Eighth Circuit has cited to both the old rules, *see Gates v. Comm'r, Soc. Sec. Admin.*, 721 F. App'x 575, 576 n.2 (8th Cir. 2018) (per curiam), and the new rules, *see Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017). As it makes no substantive difference, for ease, rather than citing to both sets of rules, I cite only to the new regulations contained in the 2018 Code of Federal Regulations unless otherwise noted.

with concentration. AR 578. The ALJ gave little weight to Dr. Risk's opinions for multiple reasons.[10] AR 23.

The ALJ found that "Dr. Risk cited no objective test result to support the symptoms he notes" in his opinions. AR 23. The ALJ did not question Gordon's diagnoses of hemicrania continua and migraines, finding her headaches constitute a severe impairment. As noted above, Dr. Risk has treated Gordon for several years, has overseen various modalities of treatment to address her headaches and accompanying symptoms, and specializes in this area. His treatment notes demonstrate he relied on MRI results, physical examinations (which included findings of decreased sensation as discussed in SSR 16-3p), and examinations by other providers. AR 439, 442, 514, 570-72, 619, 621, 635, 639, 643. It is not clear what additional objective testing the ALJ believes was needed to credit Dr. Risk's opinions, especially when considering he relied on his

---

[10] The ALJ first noted that Dr. Risk provided limitations stemming from Gordon's headaches through "submitted answers to several form questionnaires." AR 22. Although the ALJ did not specifically cite this as a basis for discounting Dr. Risk's opinions, I note that earlier in his decision, the ALJ weighed heavily the fact that Therapist Ross's opinions were contained in "a form questionnaire" (ultimately giving those opinions little weight). AR 21. The record in this case would not support discounting Dr. Risk's MSS opinions simply because they were contained in a form questionnaire. "An MSS is a checklist evaluation in which the responding physician ranks the [claimant]'s abilities, and is considered a source of 'objective medical evidence.'" *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quoting *Burress v. Apfel*, 141 F.3d 875, 879 (8th Cir. 1998)). An ALJ may discount opinions contained in this type of form questionnaire only if those opinions "stand alone and were never mentioned in the physician's numerous records of treatment nor supported by any objective testing or reasoning." *Id*. (cleaned up) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)); *see also Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011) ("A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record."). The record also contains four "Report[s] on Incapacity" from Dr. Risk. AR 482-83, 569, 609-12. These reports do not specifically address Gordon's functional limitations and could be discounted to the extent Dr. Risk opined that Gordon would be unable to work. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

extensive knowledge of Gordon's condition, his observations of her over time, and his long-term treatment of her headaches. *See Reed*, 399 F.3d at 921-22 (holding a treating source's reliance on the claimant's diagnoses, treatment history, and the source's documentation of claimant's history and observations of the claimant during multiple visits was sufficient to support the source's opinion, and that ALJ erred in relying on a lack of objective testing to discount the source's opinions that were consistent with the source's treatment notes).

In addition, the record includes extensive treatment notes from Dr. Risk and others, which outlined the various medications, injections, and other modalities Gordon has received to treat her headaches and other related issues. *See* AR 415-46, 470-74, 495-506, 513-36, 547-62, 567-68, 584-94, 616-51, 664-99; *see infra* at 8 n.9. A treating source opinion about the limiting effect of pain, which "can be directly attributed to an objective finding—a diagnosis of [hemicrania continua and migraines—]" may be substantiated by the claimant consistently seeking treatment for her pain and undergoing numerous treatments to alleviate the pain. *Singh*, 222 F.3d at 452 (finding evidence of claimant's ongoing treatment and various procedures to try and alleviate his pain (caused by nerve root irritation and recurrent herniated disc) substantiated treating neurologist's opinion about claimant's functional imitations). The record does not support the ALJ's decision to discount Dr. Risk's opinions based on a lack of objective medical testing.

The ALJ also found that Dr. Risk's opinions were inconsistent with Gordon's "mostly normal neurological findings" and "physical examination results [that] consistently included full orientation without distress." AR 23. The ALJ concluded these results were inconsistent with Gordon "experienc[ing] constant migraines." *Id*. Treatment notes of normal mental status examinations (finding no issues with a claimant's alertness, orientation, and judgment) "do not relate, specifically, to claimant's ability to function in the workplace." *Shuttleworth v. Berryhill*, No. 17-CV-34-LRR, 2017 WL

5483174, at *4 (N.D. Iowa Nov. 15, 2017). The ALJ here failed to explain how Gordon's neurological findings and physical examination results "would necessarily lead to a conclusion other than the conclusion reached by Dr. [Risk]." *Id.* (holding ALJ failed to show inconsistency between treating physician's treatment records and opinions where ALJ did not explain how claimant's normal mental status examinations were contrary to the treating source's opinions about claimant's ability to perform competitive work). In particular, the ALJ in this case did not explain how Gordon's treatment records were inconsistent with Dr. Risk's opinions about Gordon's ability to maintain attention and concentration, and her need to take unscheduled breaks and to be absent from work due to her headaches and related pain.

Conversely, Dr. Risk's opinions were also consistent with the other opinion evidence in the record. Therapist Ross found Gordon would be moderately limited in her ability to maintain concentration and attention and that she would be markedly limited in her ability to complete a normal workday or perform at a consistent pace, noting "[h]er pain impacts focus." AR 581. Therapist Ross also found Gordon's pain and stress would frequently to constantly interfere with her ability to maintain attention and concentration. AR 582. He concluded that Gordon would be off-task more than thirty percent of the time and that she would be absent from work and unable to complete a full work day five or more days per month. *Id*. Dr. Stientjes (the consultative examiner) found that although Gordon could understand simple instructions, she has issues with memory, she was slow at processing, and her "[i]mplementation could be haphazard." AR 510-11. He concluded that Gordon's "[c]ognitive process are slow and seem to be impacted by medication or other processes . . . . [and her] [p]rospect for sustained gainful employment is marginal at best." *Id.* Dr. Lovell and Dr. Tashner (state agency consultants) found Gordon was moderately limited in her abilities to understand, remember, and carry out detailed instructions; to maintain attention and concentration; and to complete a workday

17

or workweek or perform at a consistent pace. AR 78, 116-17. They specifically noted Gordon could complete "a typical work week in *a low stress environment* that is devoid of typical time pressures" (AR 79) (emphasis added), and found moderate limitations in Gordon's social functioning. AR 78-79, 117. These opinions, however, were offered in 2014, prior to Dr. Risk's treating source opinion and at a time when Gordon was still able to take indomethacin and had some relief from Botox injections. *See* AR 76-77, 79-80, 118. Since that time, Gordon had to stop taking indomethacin regularly due to the side effects, and injections did not provide continued relief. AR 618-23, 633, 638-45. Also, Gordon's condition later worsened, starting in March 2015. AR 616-19, 631, 664-89; *see also* AR 118 (Dr. Tashner noted in October 2014, in affirming the initial review on reconsideration that Gordon's mental condition had not worsened). Gordon's worsening condition may explain differences between the opinions of the state agency consultants and Dr. Risk and Therapist Ross. As noted above, Gordon has tried numerous other medications and treatment modalities with no significant relief. Overall, Dr. Risk's opinion was consistent with the other medical opinions in the record, which contradicts the ALJ's decision to not give Dr. Risk's opinion controlling weight.

The ALJ also found Dr. Risk's opinion inconsistent with Gordon providing childcare. AR 23. The ALJ specifically relied on Gordon being able "to engage in childcare 40 hours per week with her admission that she received no help in doing so." *Id*. As discussed earlier, the ALJ failed to address that Gordon stopped providing childcare and that her condition worsened. Dr. Risk's opinions were therefore not necessarily inconsistent with Gordon's activities of daily living, and this was therefore not a good reason to give those opinions less weight.

The ALJ failed to show that Dr. Risk's opinion was not supported by the record or that it was inconsistent with the overall record. The ALJ did not provide good reasons

for the weight assigned to Dr. Risk's opinions about Gordon's need for unscheduled breaks, being off task, and being absent.

## IV. CONCLUSION

I realize that upon remand, the ALJ may reach the same ultimate conclusion about whether Gordon is disabled, "but the determination is one the Commissioner must make in the first instance." *Renshaw*, 2017 WL 417637, at *6 (citing ***Buckner v. Apfel***, 213 F.3d 1006, 1011 (8th Cir. 2000)). In light of the time that has passed since Gordon's initial application in February 2014, "the Commissioner is urged to begin proceedings without delay and resolve this case as soon as possible." *Id*.

I **reverse** the Commissioner's decision and **remand** this case to the Social Security Administration for further proceedings. Judgment shall enter in favor of Gordon.

**IT IS SO ORDERED** this 25th day of March, 2019.

_____
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa